Mr. Justice Scott delivered the opinion of the court. This case is presented on bill of exception to the overruling of a motion for a new trial. It appears from the testimony that the appellant, a merchant of Batesville, Ark., became the gratuitous agent of the appellees, who were merchants of the city of Philadelphia, to compromise a claim of the appellees on Burr & Tucker of the former town, and to receive from them the proceeds in money to the use of the appellees. It does not appear that any instructions were given to the appellant to transmit the money from Batesville to the city of Philadelphia, and none can be implied from the nature of the transaction. The appellees, however, wrote to the appellant that “if in fact they were not much pressed for funds” at that time they would not have made to Burr & Tucker such an offer of compromise. But this letter does not justify any farther inference than that the appellant was to receive and keep appellees’ money as their gratuitous bailee. The contract then was a deposit, a naked bailment of money to be kept for the bailor without recompence; and consequently, if the appellant, alter the receipt of the money, had remained r passive and the money had been lost from his possession, his liability would have depended upon the ascertainment of the fact whether or not the loss had been caused by gross negligence on his part. He did not, however, remain passive, but attempted without authority to transmit the money to the appel-lees and it was lost by the failure of his agent in New Orleans while in transitu, between Batesvillo and Philadelphia. This attempt was made the next day alter the receipt of the money and the appellees were promptly advised through the mail of the remittance. But however honorable and praiseworthy was this elfort to anticipate the expressed wants of the appellees and in this to do them kindness, the law from enlarged views of sound public policy sternly animadverts upon this well meant procedure; and holds the plaintiff liable for the loss unless he can extricate himself by some subsequent ratification of his unauthorized act. The question in such case being, not whether the party has acted from good motives and without fraud, but whether he has done his duty and acted according to the confidence reposed in him. For having exposed his principal to a”j risk to which he did not consent, by shifting upon another the/ personal trust and confidence reposed in himself; and thus go-| ing beyond the confines of his authority, the source of which was his principal’s opinion of his personal prudence, skill and integrity, his unauthorized act disrobes him of all cover from the principle of law we have just mentioned — there being no place for its application to results which flow from unauthorized acts. Butaratification of this unauthorized act of remittance will save him from loss if it shall appear in the sequel that by this means he has had a sufficient new delegation of authority and has faithfully discharged his corresponding duties. Because the legal ef-feet of the subsequent ratification, of a given unauthorized act is equivalent to a previous delegation of authority to do that particular act, the ratification relating back to the inception of the transaction. This being the universal legal effect of ratification unless perhaps in cases where third persons acquire rights after the given act is done and before it receives the recognition and sanction of the principal, its retrospective efficacy in such cases being subservient to such intervening rights. The vital question then in the case at bar the solution of which must result in the fixing of loss upon one of the two innocent contending parties, is whether or not the appellees ratified the attempted remittance. The authorities, all agree, that although ratification may be implied as well as express, nevertheless there can be no ratification binding upon the principal, which was not made with a full knowledge of all the material circumstances of the case. (9 Peters R. 629.) Hence the rule that implied ratification extends only to such acts of the agent as were known to the principal at the time, (Thorndike vs. Godfrey, 3 Greenl. 429); and if the rati ideation be without such knowledge of material facts it will not be obligatory whether this want of knowledge arise from designed or undesigned concealment or misrepresentation of the agent, or from his mere innocentinadvertance : and this, whether the question arise between the principal and his agent, or between the former and third persons. Story on Agency, sec. 243, p. 288, 289. Then, in the case at bar was there any concealment of any fact or circumstance connected with the attempted remittance material for the appellees to know? It was communicated to them that the amount of their claim against Burr & Tucker had been collected and remitted to Walton & Sheafe, of New Orleans, with instructions to them to transmit to the appellees at the city of Philadelphia, without delay, by draft upon the east. But the mode of remittance between Batesville and New Orleans was not communicated. In order to estimate the materiality of the fact not communicated and consequently never ratified, as rati-ideation can only be of the facts communicated, the relative situation of the parties in point of locality and every other point of view must be considered. Among these it may be important to remember that the appellees were in Philadelphia, a great commercial city, and the appellant, their agent, at Batesville, an inconsiderable town in the interior of Arkansas, where commercial facilities were few. A place, which had scarcely been reached by the spray of commerce, much less had the depths and shoals and currents of trade at this point, been marked upon the great commercial -chart, so as to afford the appellees any data for the approval or disapproval of any mode of remittance that might have been adopted by their agents and communicated to them, or for the suggestion of a mode themselves. Then, so far as their interest was concerned it was surely to their advantage to be committed t© no particular mode of remittance — at most but an incident to the power of remittance — as they thereby secured a guarantee of such a mode as the appellant, as a man of ordinary prudence and skill, with full knowledge of the course and usages of trade -in this particular region, would adopt for remittances of his own money to New Orleans. Not so, however, to the same extent, either as to the bailee in New Orleans, or as to the mode of remittance from that city to Philadelphia; for as to these particulars the appellees from their commercial position enjoyed facilities for data upon which to form correct conclusions. But even as to these latter particulars, we would hesitate before we would declare that a failure to communicate, even them, would invalidate a ratification of an act of remittance which had been communicated only in general terms, as that it had been made through a respectable commercial agent in New Orleans. And this for the reason that we have already given, that is to say, the mode of remittance is. but incidental, and when noneis prescribed by the principal, it is distinctly prescribed by the law. Then we cannot regard the failure of the appellant to communicate to the appellees the mode of remittance that he had adopted between Batesville and New Orleans as a circumstance so material as to work the invalidation of the subsequent ratification of the unauthorized act of remittance, if any such ratification was made :and whether or not there was such ratification, the law and the testimony will determine. Judge Story, in his work on Agency, when speaking of the efficacy of silence and acquiescence to work a ratification, says (sec. 225,p. 302,) “ In the ordinary course of business between merchants and their correspondents, it is understood to be the duty of the one party receiving a letter from the other to answer the same within a reasonable time, and if he does not, it is presumed that he admits the propriety of the acts of his correspondent and confirms and adopts them. This presumption seems now in favor of commerce to be universally acted upon. And therefore if the principal having received information by letter from his agent touching the business of the principal, and does not, within a reasonable time, express his dissent to the agent, he is deemed to approve his acts and his silence amounts to a ratification of them.” And again, he says, (Sec. 253, p. 297,) when speaking of implied ratification by the acts and proceedings of the principal in pais, “It is by no means necessary that there should be any positive or direct confirmation. And, for this purpose, the acts and conduct of the principal are construed liberally in favor of the agent.” And, among the numerous authorities cited by him to sustain these positions, is the case of Bredin vs. Duberry, (14 Serg. & Rawle 30,) where the court, by Gibson, J., says : “I take it to be indisputable that a principal who neglects promptly to disavow an act of his agent by which the latter has transcended his authority, makes the act his own. He is bound to disavow it at the moment the fact comes to his knowledge.” This latter enunciation of the rule seems too strongly expressed for general application, although in many cases where the agent has placed himself in a predicament where loss may accrue to him from delay on the part of his principal to disavow the act, or where the transaction may turn out a profit or loss according to the circumstances, there would seem much of justice in its application. For it would seem unjust and unreasonable in the principal, by delaying his election to be bound or discharged to secure himself the profit or avoid the loss according to the event; and by this means work an unmerited injury to an honest and well-intentioned agent, who has acted in the premises with the best motives and in good faith. Prince vs. Clarke, 1 Barn. & Cress. 186. Courcier vs. Ritler, 4 Wash. C. C. R. 553. The safer general rule, however, would seem to be that which Judge Story enunciates, and which is well sustained by almost all the authorities, that is, that the dissent must be expressed in a reasonable time after the information has been received, and thus the circumstances of each particular case will be regarded in determining the degree of promptitude incumbent upon the principal. As, if the danger of loss by delay be imminent, any thing short of an instantaneous disavowal would be unreasonable, and if not. so great, then a corresponding abatement of the rigour of the rule graduated upon principles of justice and fair dealing. In the case at bar, the remittance to New Orleans was made about the middle of April, and it is fairly inferable from the letter of the appellees of the date of the first of June, (as it seems suggested alone by the “delay” on the part of Walton & Sheafe,) that the appellees had been promptly advised of this unauthorized act of remittance, yet there is no evidence in the record that they ever complained of it, excepted to it, or attempted to repudiate it until some time in the “ fore part of the month of August” following. In the mean time, in the latter part of the month of May preceding, Walton & Sheafe had failed. Then, if the position of ratification in this case was rested solely upon this ground, there would seem clearly abundant reason to hold that this repudiation was unreasonably delayed, and that the conduct of the appellees amounted to a complete ratification. But the appellees were not all this time silent, although they did not complain of, or disavow, the act of remittance, which, as we have seen, was promptly communicated to them; for on the first of June, they wrote to the appellant, not to complain of or disavow this act, but to inform him that the money had not yet been received by them and to make inquiry in the premises, but intimate in no way their dissatisfaction with any act of the appellant. As, at the date of this letter, they had been in possession of the advice of remittance a sufficient time to become weary of delay, and had this circumstance of “ delay” to arouse their suspicion that there might be something wrong in some quarter, they certainly had time enough to reflect upon the affair and make their election whether or not to repudiate or confirm. And the event proved that if they had promptly repudiated, the appellant might have probably saved himself from loss. Because, upon the hypothesis, which we have seen is well based, that the advice of remittance was promptly given, intelligence of repudiation might have reached the appellant, in the due course of the mails, by the middle of May at the most; and the evidence shows that the produce, or some part of it at least, was not sold until about the last of that month. This letter, then, when considered in connection with all the testimony in the case, would seem to amount of itself to a ratification. How, then, has it happened that the jury, in the face of the law and the testimony, has found a verdict against the appellant ? Manifestly this has occurred from their having been misdirected by the court in some of the instructions, and their minds drawn off from the true point at issue m the case. And these misdirections mainly relate to the matter of remittance in produce, which legitimately cut no important figure in the case. The second instruction asked for by the appellees, ought to have been refused in the terms in which it was asked, because, unless it had been qualified as the first was, it was well calculated to mislead the jury. The third instruction was much more objectionable, as it was inevitable that if the jury regarded it at all, they would be lead estray. And the same remark may be made as to the fifth of' these instructions. All this is manifest when we recur for a mo-menfc to some of the principles already laid down and to the testimony. We have seen that the legal effect of ratification is the investiture of new authority relating back to the inception of the transaction; and that, at the very least, remittance from Bates-ville to Philadelphia by the way of New Orleans, was ratified. How, then, stands the case ? Clearly in this wise: Originally, the appellant had authority only to collect and keep the money; but now, by virtue of ratification, he has additional authority to remit it to the appellees in Philadelphia.by the way of New Orleans. And no mode of remittance having been prescribed originally or subsequently by ratification, the law itself prescribes a mode : and that is, that it shall be transmitted in that mode in which a man of ordinary prudence, skill and diligence would adopt in view of the current and usage of trade at his locality, for the transmission of his own money. The true question, then, was not whether the remittance was made in any one given mode, because none such had been prescribed either by the principal or by the law, but whether or not, in adopting the mode that was actually adopted, the appellant was guilty of gross neglect. For, having been clothed with authority to remit by the operation of the law of ratification, he was again enrobed with the covering of this principle, of which, in the outset, he had disrobed himself by an act of remittance which was then unauthorized. After the ratification, the appellant stood in reference to the question that we are now considering identically as if he had been originally invested, not only with authority to collect the money, but also had then coupled with this authority an additional authority to remit the money from Batesville to Philadelphia by the way of New Orleans. This being so, he had but so to perform the duties incumbent upon him as to be clear from the legal imputation of gross neglect. And the evidence abundantly shows that he did so. The character of the agents selected in New Orleans, was, at the time of the selection, unexceptionable ; and the mode of .remittance adopted alike unexceptionable in view of the circumstances of the case and the course and usages of trade. The fact that the produce shipped was not shipped in the name or on account of the appellees, but of the appellant, so much pressed in argument as a circumstance against the appellant, is, on the contrary, a pregnant circumstance in his favor, as it show's clearly that, so far from the appellees’ money having been invested in the produce, that the latter was but the medium of its transmission to New Orleans — a mere conduit pipe through which it passed to that city — and a much safer mode of remittance than by the actual transmission of the specie itself, as it appears from the testimony that it was impracticable to insure the latter and that the former was actually insured. These instructions, then, had a direct tendency to mislead and bewilder the jury, and draw off their minds from the true issue in the case, and to turn them upon matters of no import as connected with the issue. In all this there was manifest error. But there was no error in the. refusal to permit the witness, Fontaine, to answer the question propounded to him that was saved by exception. Under the pleading and evidence in this case, the appellees had a right to recover the $73 70, paid over by Walton & Sheafe to the appellant, because this was a part of their money which had been remitted to that house through the medium of the produce. And they also had a right to recover- the additional sum of the difference between the aggregate sum made up by adding the $300 in specie to the nett amount of the proceeds of the produce (which aggregate sum was necessarily the true amount of the actual remittance) and the sum of $865 31, which was the sum collected from Burr & Tucker. That is to say, if that aggregate sum was $788 19, as it seems to have been by the deposition of Walton, then, as $865 31 was the amount collected of Burr & Tucker, it results that $77 14 was the additional sum that they had a right to recover. And this because the money of the appellees was never actually invested in produce, so as to subject them to profit or loss by the fluctuation of the market, as it would have been if a bill of exchange on New Orleans had been purchased in Batesville in their name; but this adventure in the produce was an adventure of the appellant: And the office of the testimony going to show that the produce, added to the $300 remitted, was worth more when it was shipped from Batesville than when it was sold in New Orleans, is only to relieve the appellant from the imputation of bad faith in giving advice to the appellees that the whole of their money had been remitted, when, in truth, either from the fluctuation of the market or bad conduct of Walton & Sheafe, the whole sum had not been remitted by the sum of $77 14. In the light of these views, then, it is our opinion clearly that the court below erred in refusing the motion for a new trial, and for this error the judgment must be reversed, a new trial awarded, and the cause remanded to be proceeded with.